UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————

N<sup>o</sup> 04 Civ. 5188 (RJS)

——————————

ARNOLD BENITEZ,

Plaintiff,

VERSUS

MICHAEL ASTRUE, COMMISSIONER OF SOCIAL SECURITY,

Defendant.

——————————

MEMORANDUM AND ORDER
May 23, 2008

——————————

RICHARD J. SULLIVAN, District Judge:

Plaintiff Arnold Benitez brings this action to challenge the May 12, 2004 final determination of the Commissioner of the Social Security Administration[1] (the "Commissioner" and the "SSA," respectively) denying his claim for Supplemental Security Income ("SSI") under the Social Security Act, 42 U.S.C. § 401 *et seq.* (the "Act"). Benitez moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, requesting that the Court reverse the Commissioner's decision and remand for further administrative proceedings. The Commissioner cross-moves for judgment on the pleadings affirming the decision. For the reasons herein, Benitez's motion is denied

---

[1] Plaintiff's complaint names former Commissioner of Social Security Jo Anne B. Barnhart as the defendant. Michael J. Astrue, the current Commissioner, automatically is substituted as the defendant pursuant to Fed. R. Civ. P. 25(d)(1).

and the Commissioner's motion for judgment on the pleadings is granted.

I. BACKGROUND

A. The Facts[2]

1. Personal History

Benitez was born on July 6, 1938, and was sixty-four years old at the time when SSI benefits were denied. (Tr. 104, 474.) He completed eleventh grade and can speak and write in English. (Tr. 474.) At the time of his administrative hearing, Benitez was separated from his wife (Tr. 444), and living alone at New Era Veterans, a facility for veterans with physical and mental health problems. (Tr. 467-67A.)

According to Benitez, after serving in the military from 1955 to 1957, he became a diamond setter in 1963 and spent most of his working life in that profession. (Tr. 444-45, 447.) As a diamond setter, he mounted diamonds on rings using a machine and performed his work while sitting. (Tr. 477.) He worked for a variety of companies and then became self-employed. (Tr. 476.) From 1987 to 1994, Benitez was incarcerated. (Tr. 190, 447, 482-83.) After his release, he briefly returned to his job as a diamond setter. (Tr. 445, 478.) In 1996, Benitez went to Puerto Rico to work in a family restaurant, but he returned to New York shortly thereafter because he was unable to financially contribute to the business. (Tr. 445-46, 478.) Benitez has not performed any work since 1996; his only income since that time has been public assistance and Social Security retirement benefits. (Tr. 478-79, 474.)

Benitez claims he is unable to work because of asthma, post-traumatic stress disorder ("PTSD"), and depression. (Tr. 447-48, Tr. 475, 482.)

2. Medical History

a. Mental Health Impairments

i. Depression

On October 4, 1996, Benitez was taken by ambulance to Jacobi Medical Center after expressing a desire to commit suicide to his probation officer. (Tr. 198.) The intake examination revealed that he had no past psychiatric hospitalizations, but he had become increasingly depressed because he had separated from his wife and was facing imminent eviction from his home. (Tr. 198-99.) He had not been sleeping or eating and exhibited poor judgment, insight and impulse control. (*Id.*) On admission, he was diagnosed with adjustment disorder with depressed mood and suicidal ideation. (Tr. 199.) Benitez was admitted for inpatient hospitalization and responded well to treatment. (Tr. 200, 202.) Upon his discharge on November 29, 1996, his affect was brighter, his mood euthymic, and he no longer had suicidal thoughts.[3] (*Id.*) His insight, judgment and impulse control were all described as "fair." (*Id.*) On November 29, 1996, he was medically and psychiatrically cleared from Jacobi Medical

---

[2] All facts described below are taken from the "Transcript of the Administrative Record," filed as part of the Commissioner's motion, and will be cited as "Tr. __."

[3] A euthymic mood means that the individual's mood is in the "normal" range, i.e. neither depressed nor elevated. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 825 (4th ed. 2000) (hereinafter referred to as, "DSM-IV").

2

Center and referred to outpatient treatment at Metropolitan Hospital. (Tr. 202-203.)

While in outpatient treatment at Metropolitan Hospital, Benitez was diagnosed with an adjustment disorder with a depressed mood. The doctor also noted that a depressive disorder "NOS" (not otherwise specified) was to be ruled out. (Tr. 280-83.) He was treated with Paxil and noted to be compliant with his medication. (Tr. 286.) Consulting psychiatrist Dr. Katz diagnosed him with manic depressive disorder with a GAF of 45 and asserted that Benitez's "employment capacity depends on an evaluation of his psychiatric condition."[4] (Tr. 224.)

His condition continued to improve and, by 1997, his depression was in remission.[5]

Dr. Luigi Marcuzzo, a consulting psychiatrist from HS Systems, diagnosed Benitez as having major depression with psychotic features in partial remission on February 10, 1997.[6] (Tr. 227.) He found no limitations on Benitez's memory and understanding, but noted "some limitation on sustained concentration, persistence, social interaction and adaptation due to Benitez's depression." (*Id.*) Dr. Marcuzzo believed that Benitez could be employed in a low stress, part-time job. (*Id.*) In May 1997, Dr. Carlos Ruiz, a psychiatrist at Benitez's residential facility, New Era Veterans, diagnosed his major depression to be in remission and noted that his GAF was 85, observing that he was "goal directed on achieving a job and permanent independent housing."[7] (Tr. 372, 374.) Benitez stopped taking medication for depression by August 1997, but agreed to continue therapy to guard against any relapses in his condition. (Tr. 287.) Upon subsequent visits in May 1998 and July 1999, Dr. Ruiz's diagnosis remained essentially the same: major depression in remission and a GAF of 90. (Tr. 378, 382.)

ii. PTSD Diagnosis

---

[4] "GAF" refers to the individual's global assessment of functioning. On the DSM-IV multiaxial scale that assesses an individual's mental and physical condition on five axes, each of which refers to a different class of information, the GAF is cited on Axis V. *DSM-IV* at 27. Axis I refers to clinical disorders; Axis II refers to developmental and personality disorders; Axis III refers to general medical conditions; and Axis IV refers to psychosocial and environment problems. *Id.* A GAF of 45 represents symptoms that present a serious impairment of social, occupational, or school functioning. *Id.* at 34. The GAF scale is a declining scale in which lower scores indicate more severe symptoms.

[5] Over the course of monthly appointments at Metropolitan Hospital, Benitez's affect was deemed to be "brighter" and he reported that he was "doing well." (Tr. 284-85.) He indicated that he felt encouraged about finding a new apartment and getting out of the shelter situation he was living in at the time. (*Id.*) He also expressed hopefulness that his family and friends would help him start his jewelry business again. (Tr. 284.)

[6] Dr. Marcuzzo noted that Benitez had feelings of hopelessness, helplessness, and poor self esteem, but during his evaluation, Benitez was pleasant, cooperative, appropriately dressed, and related appropriately to the interviewer. (Tr. 226.)

[7] A GAF between 80 and 90 represents absent or minimal symptoms and good functioning in all areas. *DSM-IV* at 34.

3

Dr. Ruth Shaffer diagnosed Benitez with PTSD in April 1998.[8] Dr. Shaffer and Benitez met in bi-monthly or monthly sessions. She also completed several Psychiatric/Psychological Impairment Questionnaires assessing Benitez's condition. Dr. Shaffer subsequently diagnosed PTSD, major depression recurrent in remission, asthma, and a GAF on Axis V of 60 in a psychological assessment questionnaire completed on February 20, 2002.[9] (Tr. 292.) She noted that PTSD is a lifelong condition for which there is no cure. (*Id.*) She observed that Benitez suffered from sleep and mood disturbances, pervasive loss of interest, paranoia, feelings of guilt and worthlessness, social withdrawal and isolation, intrusive recollections of a traumatic experience, difficulty maintaining close, trusting personal relationships, and mistrust of authority figures. (Tr. 293.)

With respect to functioning at work, Dr. Shaffer indicated Benitez had no limitations on understanding and memory or the ability to carry out detailed instructions, sustain ordinary routine without supervision, and maintain socially appropriate behavior. (Tr. 295-97.) She noted mild limitations on Benitez's ability to maintain attention and concentration for extended periods, to get along with co-workers without distracting them, and to respond appropriately to changes in the work setting. (*Id.*) Benitez's ability to perform activities within a schedule, maintain regular attendance, work in coordination with others without distraction, complete a normal workweek, interact appropriately with the general public, respond appropriately to criticism from supervisors, and set realistic goals were all moderately limited. (*Id.*) Dr. Shaffer further observed that under stress, Benitez would leave work early or call in sick and that PTSD can trigger an asthma attack. (Tr. 297-98.) She believed Benitez would miss work more than three times a month. (Tr. 299.) She noted that Benitez was not taking any medications to treat his condition. (Tr. 297.)

Dr. Shaffer completed another psychiatric assessment form on September 13, 2002 that was consistent with her prior diagnosis. (Tr. 384-88.) She noted Benitez was taking medication for asthma, but not for psychiatric problems. (Tr. 385.) Her assessment of Benitez's work abilities was good to fair in terms of his ability to adjust to a job, including following rules, relating to co-workers, dealing with stress, maintaining concentration, and making social adjustments. (Tr. 386-87.) His ability to understand and carry out complex or detailed instructions was very good. (Tr. 386.) She indicated Benitez had no memory impairment (Tr. 384), and when he was not distracted by intrusive thoughts, he had the ability to perform well. (Tr. 387.) Dr. Shaffer opined that his difficulties establishing personal relationships made him "a poor candidate for employment." (*Id.*)

Nearly a year after SSI benefits were denied, Dr. Shaffer completed another Psychiatric/Psychological Impairment Questionnaire, dated January 29, 2004. (Tr.

---

[8] Dr. Shaffer noted Benitez had significant post-traumatic stress symptoms, including sleep difficulties, hypervigilance, intrusive memories, and extreme difficulty trusting people. (Tr. 370.)

[9] A GAF of 60 represents symptoms that present moderate difficulty in social, occupational, or school functioning. *DSM-IV* at 34.

4

427-34.)[10] The diagnosis was the same: PTSD with a GAF of 60. (Tr. 427.) Benitez exhibited some additional symptoms including poor memory, recurrent panic attacks, difficulty thinking or concentrating, and generalized persistent anxiety. (Tr. 428.) He also showed marked limitations in certain work related functions, including his ability to maintain attention and concentration for extended periods, maintain regular attendance, work in coordination with or in proximity to others without being distracted by them, and respond appropriately to changes in the work setting. (Tr. 430-32.) Dr. Shaffer opined that he was capable of tolerating low stress workplaces, but unable to work in a team environment due to his inability to trust co-workers and authority figures. (Tr. 433.)

The consulting psychiatrists agreed with Dr. Shaffer's diagnosis of PTSD, but differed as to the extent of Benitez's PTSD and how it interfered with his ability to carry out work related functions.

On March 4, 2002, Dr. Eugene Allen, consulting psychiatrist from Diagnostic Health Services, Inc., diagnosed Benitez with, *inter alia*, post-traumatic stress disorder. (Tr. 273.) He opined that Benitez "has a fair ability to understand, carry out and remember instructions and a fair ability to respond appropriately to supervisors, co-workers and work pressures in a work setting, perhaps in a sheltered type setup." (*Id.*) Dr. Allen also found that Benitez's mental impairments did not limit his ability to understand, remember and carry out instructions, and only slightly limited his ability to work with others. (Tr. 275-76: Medical Source Statement of Ability To Do Work Related Activities Questionnaire.)

Dr. Charles Rosenbloom offered a diagnosis of PTSD on August 12, 2002. (Tr. 324-32.) He also diagnosed Benitez with depressive disorder, bronchial asthma, sleep apnea, hypertension, and gave him a GAF of 45 on Axis V, significantly lower than the GAF of 60 diagnosed by Dr. Shaffer.[11] (Tr. 324.) Dr. Rosenbloom opined that Benitez was "totally disabled emotionally and unable to function in any job in any capacity." (Tr. 334.) Dr. Rosenbloom observed that Benitez was markedly limited in his ability to perform most work-related functions, including his ability to sustain concentration for extended periods and his ability to interact with others. (Tr. 322-23.)

b. Physical Impairments

Benitez also claims to be disabled because he has asthma. An internal medical exam by Dr. Peter Graham showed Benitez's pulmonary functioning to be "grossly within normal limits" on February 10, 1997. (Tr. 234-38, Tr. 235.) A chest x-ray taken that day demonstrated no "acute lung pathology." (*Id.*) During the exam, Benitez was oriented and alert, with no memory difficulties or problems walking or sitting. (Tr. 234-35.)

---

[10] *See infra* at note 15 (discussing legal relevance of evidence added to the administrative record after the ALJ's determination.)

[11] Dr. Rosenbloom indicated that Benitez was suffering from flashbacks and nightmares, had withdrawn from people and former interests, and was easily angered. (Tr. 324-34.)

5

Subsequently, on April 4, 1997, Benitez was treated at the Bronx VA Hospital after complaining of chest pressure. (Tr. 353.) He was diagnosed as a healthy 59 year old smoker with atypical chest pain, who had recently recovered from an upper-respiratory infection and a cough. (Tr. 354.) An April 11, 1997 radiology report failed to demonstrate any evidence of cardiac, pleural or pulmonary abnormality. (Tr. 355.) A stress test performed on May 8, 1997 was normal. (Tr. 242-43.) A pulmonary function analysis performed on November 3, 1999 found a mild obstructive lung defect, but lung volumes and diffusion capacity were within normal limits. (Tr. 261-65.)

On May 10, 2001, Benitez was also treated at Westchester Square Medical Center's emergency room for an attack of acute asthma bronchitis. (Tr. 399-406.) Benitez told doctors he suffered from a history of asthma, but that he had never been intubated nor was he currently taking steroids for his condition. (Tr. 401). He was given two inhalant medications and reported feeling "much better" upon his discharge the same day. (Tr. 400, 403).

Benitez also testified he was treated for asthma at the Western Queens Community Hospital (Tr. 481), but the hospital records provided do not describe the severity of his condition (Tr. 244).

B. Administrative Proceedings

Benitez applied for SSI benefits on January 14, 1997, alleging that he became disabled on January 31, 1994 as a result of manic depression and asthma. (Tr. 104-107, 124.) His application was initially denied, and then denied on reconsideration. (Tr. 44-47, 50-53.) Benitez requested a hearing, (Tr. 54), which was held before Administrative Law Judge Irving Fliegler on August 12, 1998. (Tr. 439-463.) Benitez appeared *pro se* and testified. (*Id.*) Specifically, Benitez testified that while he is a life-long asthmatic, the attacks had worsened over the prior two years. (Tr. 448.) According to Benitez, he used a home nebulizer machine, but his asthma medication had become ineffective (Tr. 456), making it necessary to go to the hospital for treatment, including adrenaline or steroid shots and oxygen. (Tr. 448-49.) He testified that he had asthma attacks every two or three weeks during which he could not walk or breathe. (Tr. 449-50.) During the summer, he did not experience attacks, but rather fatigue. (Tr. 450.)

Benitez testified that he also suffered from depression, but asserted that his condition was under control. (Tr. 448.) Benitez testified that his depression played a role in his inability to work because anxiety sometimes triggered his asthma attacks. (Tr. 448.)

Benitez also testified about his daily activities. He testified that he cooked his own meals, shopped, performed household chores, read, and occasionally went to church or the library. (Tr. 458-60.) He did not have problems sitting or standing, but became fatigued and suffered from tightness in his chest after walking about half a block. (Tr. 460.) He normally could lift twenty-five pounds and occasionally he could lift about fifty pounds. (Tr. 460-61.)

In a decision issued on November 24, 1998, Judge Fliegler found that Benitez was

not disabled and denied his claim for SSI benefits. (Tr. 35-39.) Benitez appealed the decision and retained counsel for the appeal. (Tr. 64, 101-02.) On December 13, 2001, the Appeals Council issued an order vacating the decision and remanded the case for additional proceedings to further develop the administrative record and evaluate Benitez's physical and mental impairments. (Tr. 41-43.)

A supplemental hearing was held on August 16, 2002, before Administrative Law Judge Robin J. Artz (the "ALJ") in which Benitez, who was represented by his attorney, appeared and testified.[12] (Tr. 464-492.) Benitez testified that while he was a life-long asthmatic, the attacks had worsened over the last two years. (Tr. 470.) Benitez stated that his asthma was primarily triggered by cold weather, and sometimes stress or allergens like detergent, dogs, and fumes, including perfume or cigarettes. (Tr. 479.) Benitez testified that during the winter, he would get asthma attacks almost every day. (Tr. 480.) He testified that he had been to the emergency room three or four times in the past year from asthma attacks. (Tr. 480.) He testified that he was treated at the Bronx Veterans' Affairs Medical Center ("Bronx VA"), Westchester Square Hospital, and had spent a week at the Westin Community Hospital. (Tr. 480-81.) He testified that he used a home pump as well as pills for his asthma, but also required adrenaline or steroid shots. (Tr. 480-482.)

[12]While hearings were held before two administrative law judges, all references to "the ALJ" in this opinion are specifically in reference to ALJ Artz unless indicated otherwise.

Benitez further testified that he was diagnosed with PTSD as a result of his time in prison. (Tr. 475, 482.) He stated that he did not take any medication to treat his PTSD, but that he was in therapy. (Tr. 485.) He also indicated that he took Ambien to treat a sleep disorder. (*Id.*)

Benitez testified that he also sees a psychiatrist for depression, but did not state that he was taking medication for his depression. (Tr. 486.) According to Benitez, his depression began after his release from prison and his unsuccessful business venture in Puerto Rico. (Tr. 482-84.) Benitez testified that his depression played a role in his inability to work because anxiety sometimes triggered his asthma attacks. (Tr. 479.)

Benitez testified that he normally kept to himself and his daily activities included going to the library, watching the television news or occasionally listening to music, but that he did not cook his own meals. (Tr. 486-88, 490.) He was able to take public transportation. (Tr. 488.) Although Benitez testified he could walk as far as he wanted to, he also said he got fatigued after two or three blocks and may have possible circulation problems in his legs. (Tr. 488-89.)

In a decision issued on February 26, 2003, the ALJ, reviewing the case *de novo*, found that Benitez was not disabled under the Act. (Tr. 16-29.) Specifically, the ALJ concluded that Benitez "has a severe impairment or combination of impairments, but retains the residual functional capacity to perform medium work activity." (Tr. 17.) The ALJ held that while Benitez was unable to perform

his past work, he would be able to do other work. (Tr. 17, 16-29.)

Benitez appealed, but on May 12, 2004, the Appeals Council denied review and the ALJ's decision became the final decision of the Commissioner. (Tr. 12-13, 8-11.) This appeal followed.

## II. DISCUSSION

### A. Standard of Review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). The Act provides that the "findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); *see also Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996). Therefore, the Court will set aside an ALJ's decision "only where it is based upon legal error or is not supported by substantial evidence." *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quoting *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998)). Substantial evidence, in this context, is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's decision is afforded considerable deference and the reviewing court should not "substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (quoting *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)).

### B. Applicable Law

A claimant is entitled to Social Security benefits under the Act if the claimant is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months" and where the existence of such impairment was demonstrated by evidence obtained by medically acceptable clinical and laboratory techniques. 42 U.S.C. § 1382c(a)(3)(A); *see, e.g.*, *Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The impairment must be of such severity that the claimant

> is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

Social Security regulations set forth a five-step inquiry by which the Commissioner is to evaluate a claim for SSI disability benefits. *See* 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits [his] capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform [his] past relevant work. Finally, if the claimant is unable to perform [his] past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof as to the first four steps; the Commissioner bears the burden of proving there is other work existing in the national economy that the claimant could perform in the last step. *Id.*

C. The ALJ's Decision

The ALJ applied the aforementioned five-step inquiry in her decision. The ALJ first determined that Benitez had not been employed since January 14, 1997, the date Benitez's application was filed, based on Benitez's testimony and evidence in the record. (Tr. 18, 27.) In the second step of the five-step inquiry, the ALJ considered whether Benitez had any severe impairments that imposed more than a minimal or slight limitation on his ability to perform basic work activities. (Tr. 18, 28.) She determined that Benitez's PTSD and bronchial asthma were severe based on the medical evidence. (Tr. 18-19.) The ALJ noted his "history of major depression, recurrent, in remission," but did not hold that it was a severe impairment. (Tr. 19.) Nevertheless, in the third step of the five-step inquiry, the ALJ determined that Benitez "does not have clinical or laboratory findings which meet or equal in severity the clinical criteria of any impairment listed in Appendix 1, Subpart P, regulations No. 4." (*Id.*) Because Benitez did not have a listed impairment, the ALJ proceeded to step four of the five-step inquiry.

In step four, the ALJ considered whether Benitez could return to his past relevant work.[13] The ALJ determined that Benitez could not return to his past relevant work as a diamond cutter, because diamond cutting was a skilled, sedentary job that required extensive sitting as well as frequent contact with the public and excessive stress. (Tr. 28.)

In step five of the five-step inquiry, the burden of proof then shifted to the

---

[13]Relevant work is usually work that must have been performed within the last 15 years or 15 years prior to the date the disability was established. *See* 20 C.F.R. §§ 404.1565, 416.965. In addition, the work must have lasted long enough for the claimant to learn to do the job and meet the definition of substantial gainful activity. *Id.*

9

Commissioner to show that Benitez had the residual functional capacity to perform other jobs existing in the national economy. (Tr. 27.) The ALJ determined that Benitez had residual functional capacity to perform medium work activity consisting of simple repetitive tasks in a clean air environment not requiring exposure to dust, chemicals, smoke, noxious inhalants, or temperature or humidity extremes on a sustained basis.[14] (Tr. 20-21.) The ALJ also found that Benitez's capacity for the full range of medium work was not significantly compromised by any nonexertional limitations. (Tr. 26.) The ALJ then applied Rules 203.12 and 203.04 of the Medical-Vocational Guidelines in Appendix 2 to Subpart P of Regulations No. 4 to decide that the claimant was not disabled, in that "the claimant retains the residual functional capacity to do other work that exists in significant numbers in the national and regional economies pursuant to the Social Security Regulations." (*Id.*)

D.  Plaintiff's Arguments

In seeking reversal of the ALJ's decision, Benitez makes four arguments. First, he argues that the ALJ misinterpreted the treating physician's medical opinion. Second, he argues that the ALJ's decision is not supported by substantial evidence. Third, he argues that the ALJ should not have applied the Medical-Vocational Guidelines to Benitez because Benitez's impairments were non-exertional in nature. Fourth, he argues that the ALJ erred in finding Benitez not to be credible. The Court will consider each argument in turn.

1. The Treating Physician Rule

Benitez first argues that the ALJ failed to appropriately apply the treating physician rule. Benitez concedes that the ALJ applied the correct legal standard by giving controlling weight to the treating physician, Dr. Shaffer. Nevertheless, Benitez argues that the ALJ mischaracterized the content of the treating physician's reports. (Pl.'s Mem. at 13, 15.)

The treating physician rule gives the claimant's treating physician's opinion controlling weight as to the nature and severity of the claimant's impairments unless the opinion is not "well supported by medically acceptable clinical and laboratory diagnostic techniques" or is "inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2); *see Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). In analyzing a treating physician's report, "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." *McBrayer v. Sec. of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983). Rather, under the regulations, *see* 20 C.F.R. § 404.1527(d)(2), "the Commissioner is required to provide 'good reasons' for the weight she gives to the treating source's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir. 2004). Thus, a treating physician's statement that the claimant is disabled is not alone determinative; the ultimate findings are "reserved to the Commissioner." *Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir. 1999).

---

[14]Medium work activity involves lifting no more than 50 pounds maximum with frequent lifting or carrying of objects weighing up to 25 pounds. 20 C.F.R § 416.967(c).

10

Dr. Shaffer, the treating physician, determined that Benitez had a GAF of 60 and that he was moderately limited in several areas of social functioning. The ALJ concluded that, despite these limitations, plaintiff retained residual functional capacity. The Court identifies no error in this conclusion, or in the ALJ's interpretation of Dr. Shaffer's findings.

According to the regulations, residual functional capacity is defined as "the most" a claimant "can still do *despite* his limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a) (emphasis added). The ALJ must assess a claimant's residual functional capacity "based on all the relevant evidence in [the] case record." *Id.* The regulations further provide that:

> When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce your ability to do past work and other work.

20 C.F.R. §§ 404.1545(c), 416.945(a).

When read in full, Dr. Shaffer's reports provide substantial evidence in support of the ALJ's conclusion.[15] Dr. Shaffer indicated that Benitez was moderately limited in his abilities to perform activities within a schedule and maintain regular attendance. She also stated that he was "not a good candidate for employment." (Tr. 295-97, 387.) However, applying the regulations and the treating physician rule, the ALJ correctly determined that Dr. Shaffer's reports did not indicate that Benitez's limitations were sufficiently severe to as to preclude all work activity. (Tr. at 28.) None of Dr. Shaffer's evaluations showed any limitations on Benitez's understanding, memory, or ability to carry out simple instructions. (Tr. 295-97, 386-87.) Dr. Shaffer also found only mild limitations in Benitez's ability to concentrate for extended periods of time and his abilities to get along with co-workers and respond appropriately to changes in the work setting. (*Id.*)

Benitez also argues that the ALJ incorrectly interpreted Dr. Shaffer's GAF of 60 to "indicate only mild mental limitations." (Tr. 21.) A GAF from 51-60 indicates

---

[15] After the ALJ's decision, Benitez submitted an additional report from Dr. Shaffer from 2004 to the Appeals Council. (Tr. 427-34.) In *Perez v. Chater*, 77 F.3d 41 (2d Cir. 1996), the Second Circuit held that district courts may consider evidence that was added to the administrative record after the hearing before the ALJ. However, such evidence must relate "to the period on or before the ALJ's decision." *Id.* at 45. There is no evidence that Dr. Shaffer's new report is relevant to the period of time on or before the ALJ's decision. Indeed, Dr. Shaffer's report does not contain any response to the question on page 8 of the report that asks, "In your best medical opinion, what is the earliest date that the description of symptoms and limitations in this questionnaire applies?" (Tr. 434.) Therefore, the Court will not consider it. *See Brown on Behalf of Brown v. Chater*, 932 F.Supp. 71, 75 (S.D.N.Y. 1996).

symptoms of moderate difficulty in social, occupational or school functioning. *DSM-IV* at 32. However, Benitez's diagnosis of 60 is at the highest end of the range, and closer on the scale to mild symptoms. *Id.* Moreover, as noted previously, Dr. Shaffer found that Benitez was only mildly limited in certain key areas of work-related functioning. Therefore, there is substantial evidence in the record to support the ALJ's conclusion that Benitez had only mild mental limitations.

Accordingly, the Court identifies no error in the ALJ's finding that despite Benitez's GAF score of 60 and his other limitations, he retained the ability to do certain forms of work. Indeed, the ALJ's findings on this issue are in accord with the findings of Benitez's treating physician.

## 2. Substantial Evidence Supports The ALJ's Decision

Benitez further argues that the ALJ's decision is not supported by substantial evidence because the ALJ dismissed or ignored medical evidence. (*Id.*) After carefully reviewing the ALJ's decision and the medical evidence before the ALJ, the Court finds that substantial evidence supports the ALJ's decision.

Under the regulations, the ALJ must base the decision regarding residual functional capacity on all relevant evidence in the record. *See* 20 C.F.R. § 404.1545(1)(a). While the ALJ must consider the evidence in the record, the ALJ need not "reconcile explicitly every conflicting shred of medical evidence," especially when those shreds are unsupported by the weight of the evidence in the record. *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983).

Here, the Court finds that there is substantial evidence in the record to support the ALJ's conclusion that Benitez had the residual functional capacity for medium work. Specifically, Dr. Marcuzzo evaluated Benitez in 1997 and diagnosed major depression with psychotic features in partial remission. (Tr. 226-27.) He noted no limitations on Benitez's memory and understanding, and some limitation on sustained concentration, social interaction and adaptation. (Tr. 227.) This evaluation is consistent with Dr. Shaffer's assessment of mild or moderate limitations on work-related functioning. Dr. Allen found Benitez to have a fair ability to remember and carry out instructions and respond appropriately to co-workers, and noted that Benitez had no limitations on understanding and memory (Tr. 273, 275-76), which is consistent with Dr. Shaffer's evaluation in these same areas. Dr. Ruiz, who treated Benitez, but did not evaluate Benitez's abilities in various work related functions, diagnosed Benitez's depression to be in remission and a GAF of 85 and 90, indicating mild limitations. The ALJ considered these reports in addition to Dr. Shaffer's evaluations to reach the conclusion that Benitez had the residual functional capacity for medium work.

While Dr. Katz diagnosed manic depressive disorder with a GAF of 45, indicating more severe symptoms (Tr. 224), this examination was performed very soon after Benitez's hospitalization for depression in January 1997, before his depression was under control and before his diagnosis of PTSD (Tr. 220-224). Dr. Katz also stated that Benitez's "employment capacity depends on

an evaluation of his psychiatric condition," and did not draw a conclusion about how Benitez's mental impairments would affect his work abilities. (*Id.*)

Moreover, the ALJ did not err in discounting Dr. Rosenbloom's opinion that Benitez had marked limitations in work functioning, because it was inconsistent with other medical evidence in the record. For example, Drs. Shaffer, Ruiz, Allen, and Marcuzzo found no limitations on Benitez's understanding and memory (Tr. 295, 373, 377, 381, 387), but Dr. Rosenbloom observed marked to moderate limitations in this area (Tr. 344). In addition, while Dr. Rosenbloom diagnosed a GAF of 45, Drs. Shaffer and Ruiz diagnosed Benitez with GAFs of 60 and 90, respectively.

For these reasons, the Court concludes that the ALJ's decision is supported by substantial evidence.

### 3. Misapplication of the Medical-Vocational Guidelines

Generally, the Commissioner's burden of proof at the fifth step is met by resorting to the applicable medical vocational guidelines (the "Grids"). *See Rosa v. Callahan*, 168 F.3d at 78 (internal quotation marks omitted) (quoting *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986)). In this case, Benitez asserts that the ALJ should not have applied the Grids because his impairments are primarily nonexertional in nature.[16] Specifically, Benitez submits that when a claimant "has impairments that significantly affect the ability to perform a specified range of work activity, the Grids cannot be used to satisfy the Commissioner's burden at step 4." (Pl.'s Mem. at 17.) Benitez thus seeks remand for the ALJ to re-evaluate whether the Commissioner has demonstrated that Benitez's ability to perform the full range of light work was not significantly diminished by his non-exertional impairments. (*Id.* at 18.) The Court rejects this argument.

First, although applying the Grids to determine whether plaintiff can perform jobs may be inappropriate where, as here, a claimant suffers from both exertional and non-exertional impairments, *see Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996), applying the Grids is appropriate where the claimant's non-exertional impairments do not "significantly limit the range of work permitted by [the claimant's other] limitations." *Id.* at 39 (quoting *Bapp v. Bowen,* 802 F.2d 601, 604-05 (2d Cir. 1986)). In this case, the ALJ determined as a factual matter that plaintiff's non-exertional limitations did not significantly compromise his capacity to perform medium work. (Tr. 20-21, 23-24, 29.) Only after making this threshold finding did the ALJ proceed to apply the Grids. The Court identifies no legal error in this application of the Grids. *See Snead v. Comm. of Soc. Sec.*, 473 F. Supp. 2d 437, 441 (S.D.N.Y. 2007) (adopting Magistrate's report that found it was not error for ALJ to apply Grids because claimant's non-exertional impairment imposed minimal limitations on her functional capacity to perform simple and unskilled work)*; Niven v. Barnhart*, No. 03 Civ. 9359 (DLC), 2004 WL 1933614 at *8 (S.D.N.Y. Sept. 1, 2004)

---

[16] Non-exertional limitations are limitations that make it difficult to function because one is nervous, anxious, depressed, or has difficulty maintaining attention or concentration. 20 C.F.R. § 416.969a(c)(1)(i-ii).

(upholding ALJ's reliance on Grids even though claimant suffered from non-exertional impairment because ALJ determined that claimant's functional capacity for sedentary work was not significantly reduced by her depression).

Second, substantial evidence in the record supports the ALJ's conclusions regarding plaintiff's non-exertional limitations. In her decision, the ALJ outlined in sufficient detail the medical evidence regarding Benitez's depressive disorder and PTSD, and found, based on substantial evidence as discussed above, mild to no limitations on Benitez's ability to maintain attention and concentration, function independently, and follow work rules. (Tr. 25.) In particular, as discussed above, the ALJ properly accorded "controlling weight" to the medical conclusions of Dr. Shaffer, the treating physician.

Accordingly, this Court identifies no legal error in the ALJ's application of the Grids.

4. The ALJ's Findings as to the Credibility of Benitez

Benitez argues that there was not substantial evidence in support of the ALJ's decision to reject Benitez's subjective complaints of a disabling medical condition as not credible. (*See* Pl.'s Mem. at 19.) Specifically, Benitez asserts that the ALJ rejected Benitez's testimony based on the results of Dr. Eugene Allen's evaluation, Benitez's admissions of his own daily activities, and Benitez's failure to show outward manifestations of his alleged symptoms at the administrative hearing. (*Id.*) These elements, plaintiff argues, are insufficient to disprove his subjective complaints. (*Id.*) The Court rejects this argument.

In determining the credibility of the claimant's statements, the ALJ must consider the entire case record, including the objective medical evidence, the claimant's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the claimant, and any other relevant evidence in the case record. *See Rodriguez Santiago v. Astrue*, No. 06 Civ. 7860 (DLC), 2007 WL 1982747 at *4 (S.D.N.Y. July 2, 2007); *see also* Evaluations of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, Soc. Sec. Ruling 96-7p, 61 Fed. Reg. 34,483, 34,484 (July 2, 1996). The ALJ must make more than conclusory findings. *Hernandez Jimenez v. Comm. of Soc. Sec.*, No. 07 Civ. 276 (DLC), 2008 WL 65091 at *7 (S.D.N.Y. Jan. 3, 2008). In other words, the decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* As with any finding of fact, "[i]f the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain" or other symptoms. *Perez v. Barnhart*, 234 F. Supp. 2d 336, 341 (S.D.N.Y. 2002) (quoting *Aponte v. Sec'y Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984).

14

First, Benitez argues that the ALJ relied too heavily on the opinion of Dr. Allen in rejecting Benitez's testimony as to his mental limitations. (Pl.'s Mem. at 19.) It is clear from the administrative decision, however, that the ALJ considered the entire record, including medical evidence and Benitez's own testimony, in determining that his testimony about his symptoms was not credible. The ALJ examined multiple psychiatric reports in the record, including evaluations from Metropolitan Hospital, consulting psychiatrist Dr. Marcuzzo, and Dr. Shaffer at New Era Veterans Residence in addition to Dr. Allen's report. (Tr. 21-22.) In fact, the ALJ gave controlling weight to Dr. Shaffer's evaluations as the treating physician (Tr. 22), and not Dr. Allen's report. In any event, Dr. Allen's conclusions were substantially similar to those of Benitez's treating physician, Dr. Shaffer. Both Dr. Allen and Dr. Shaffer diagnosed PTSD, diverging only minimally on how PTSD affected Benitez's residual functioning. Dr. Allen found only slight limitations on Benitez's residual mental functioning, while Dr. Shaffer's report reflected slight to moderate limits in social functioning, but no marked limitation in work related mental functioning. (Tr. 21-22.) Neither of the doctors' reports revealed signs of significant depression, psychomotor abnormalities and lethargy, weight change, thought disorder, or memory impairments. (Tr. 26.) Therefore, the Court rejects Benitez's application on this ground, especially where Benitez's own testimony was that his depression was under control and that he was no longer taking medication to treat any mental disorders. (Tr. 288, 448.)

With regard to Benitez's alleged physical impairments, substantial evidence also supports the ALJ's determination that Benitez's testimony on this issue was not credible. Benitez's pulmonary functioning exam was normal. (Tr. 234.) The Bronx VA records do not demonstrate chronically active asthma or that Benitez was ever given steroids or injections to treat his asthma. (Tr. 261-65, 355.) The evidence in the record reflects two emergency room treatments for asthma-related conditions, one in 1997 and the other in 2001 (Tr. 353, 399-406), contradicting Benitez's testimony that he had been to the emergency room three or four times in the past year to treat his asthma. (Tr. 480.) There was no evidence in the record of in-patient hospitalization for asthma. (Tr. 24.) Therefore, the ALJ correctly decided that "the substantial medical evidence viewed in a light most favorable to Benitez does not reveal an impairment that would prevent him from performing medium work." (Tr. 24.)

Accordingly, there is no indication that the ALJ inappropriately relied on Dr. Allen alone in reaching her conclusion as to plaintiff's physical limitations, or that the ALJ erred in rejecting Benitez's testimony as to his physical limitations. Based on the evidence in the record and Benitez's testimony, substantial evidence supports the ALJ's determination that Benitez's complaints were not credible.

Second, Benitez argues that the daily activities cited by the ALJ do not bear on Benitez's capacity to work. (Pl.'s Mem. at 19.) When an individual makes statements about his symptoms and/or about the intensity and persistence of pain, but the objective medical evidence does not substantiate the

symptoms alleged, the ALJ can consider various factors in assessing the claimants's symptoms, including:

> (1) *the claimant's daily activities*; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has received for relief of his pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of his pain or other symptoms; (6) any measures the claimant uses or has used to relieve his pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 416.929(c)(3) (emphasis added).

The ALJ considered Benitez's daily activities as a factor in concluding that Benitez had the residual functional capacity to do medium work. Benitez claimed he was completely disabled by his symptoms, but testified that he was able to perform a variety of daily activities, including shopping, visits to the library, watching television and some household chores. (Tr. 24-25, 226, 227, 458-59, 486, 488.) Benitez also testified that he had no problem standing, sitting, or walking, except when the weather was too cold. (Tr. 460, 488-89.) Benitez testified that he could handle objects weighing over fifty pounds occasionally and up to twenty-five pounds frequently. (Tr. 460-61.) He was able to travel independently and take public transportation. (Tr. 488.) Therefore, viewing Benitez's testimony as a whole, there was substantial evidence for the ALJ to conclude that Benitez could perform medium work consisting of simple repetitive tasks. *See Rivera v. Harris*, 623 F.2d 212, 216 (2d Cir. 1980).

Third, Benitez argues that the ALJ inappropriately relied on observations of Benitez during the administrative law hearing. (Pl.'s Mem. at 19.) Such observations are entitled to only limited weight. *See DeLeon v. Sec. of Health and Human Servs.*, 734 F.2d 930, 935 (2d Cir. 1984); *Rivera v. Schweiker*, 717 F.2d 719, 724 (2d Cir. 1983) *Carroll v. Sec. of Health and Human Servs.*, 704 F.2d 638, 643 (2d Cir. 1983). In this instance, the ALJ observed that Benitez's responses to her questions were both relevant and coherent. The ALJ further observed that there was no indication he was experiencing pain or discomfort. (Tr. 26.) However, there is no indication that the ALJ gave these observations anything but the limited weight to which they are entitled. Moreover, there is substantial evidence in the record apart from Benitez's demeanor at the hearing to support the ALJ's findings as to the credibility of Benitez's testimony regarding his condition.

### III. CONCLUSION

For the foregoing reasons, the Court finds that the ALJ's decision that Benitez was not entitled to SSI benefits is supported by substantial evidence. The Commissioner's motion for judgment on the pleadings is thus GRANTED, and Benitez's motion for judgment on the pleadings is DENIED. The Clerk of the Court is respectfully requested to enter judgment in favor of defendant and to close this case.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

DATED: May 23, 2008
New York, New York

Plaintiff is represented by Charles E Binder, Esq., Binder and Binder, 215 Park Avenue South, 6th Floor, New York, New York, 10003. Defendant is represented by John E. Gura, Jr., Esq., United States Attorney's Office, Southern District of New York, 86 Chambers Street, New York, New York, 10007.